UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**KRISTIN MARIE HASTRICH**,                                    Civil Case No. 3:13-cv-00882-KI

          Plaintiff,

                                                OPINION AND ORDER

               v.

**COMMISSIONER SOCIAL SECURITY
ADMINISTRATION**,

          Defendant.


      Tim D. Wilborn
      Wilborn Law Office, P.C.
      P. O. Box 370578
      Las Vagas, Nevada  89137

              Attorney for Plaintiff

      S. Amanda Marshall
      United States Attorney
      District of Oregon

Adrian L. Brown
U. S. Attorney's Office
District of Oregon
1000 SW Third Avenue, Suite 600
Portland, Oregon  97204

Kathy Reif
Social Security Administration
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, Washington  98104

       Attorneys for Defendant

KING, Judge:

Plaintiff Kristin Hastrich brings this action pursuant to section 205(g) of the Social
Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the
Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and
supplemental security income benefits ("SSI").  I reverse the decision of the Commissioner and
remand for further proceedings.

## BACKGROUND

Hastrich filed applications for DIB and SSI on February 14, 2006, alleging disability
beginning January 1, 1999.  The applications were denied initially and upon reconsideration.
After a hearing at which Hastrich was represented by an attorney, the Administrative Law Judge
("ALJ") issued a decision on July 29, 2009 finding Hastrich not disabled within the meaning of
the Act and therefore not entitled to benefits.  The Appeals Council remanded this decision with
instructions to obtain additional evidence about Hastrich's impairments, further evaluate her
complaints and the statements made by the lay witnesses, and obtain supplemental evidence from
a vocational expert ("VE").

Page 2 - OPINION AND ORDER

Hastrich, this time represented by a non-attorney, appeared and testified before an ALJ on January 12, 2012. The ALJ issued a decision on February 22, 2012 finding that Hastrich was not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on March 28, 2013.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. Parra v.

Astrue, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920.  First, the ALJ

determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R.

§§ 404.1520(b) and 416.920(b).  If the claimant is engaged in such activity, disability benefits are

denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a

medically severe impairment or combination of impairments.  A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work

activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe

impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the

impairment is equivalent to one of a number of listed impairments that the Commissioner

acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d)

and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is

conclusively presumed to be disabled.  If the impairment is not one that is presumed to be

disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the

claimant from performing work which the claimant performed in the past.  If the claimant is able

to perform work she performed in the past, a finding of "not disabled" is made and disability

benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the

fifth and final step to determine if the claimant can perform other work in the national economy

in light of his age, education, and work experience.  The burden shifts to the Commissioner to

show what gainful work activities are within the claimant's capabilities.  Parra, 481 F.3d at 746.

The claimant is entitled to disability benefits only if he is not able to perform other work.  20

C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial

evidence and is based on correct legal standards. Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir.

2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less

than a preponderance. Id. (internal quotation omitted). The court must uphold the ALJ's

findings if they "are supported by inferences reasonably drawn from the record[,]" even if the

evidence is susceptible to multiple rational interpretations. Id.

## THE ALJ'S DECISION

The ALJ determined Hastrich has the following severe impairments: depression, trigger

finger, degenerative joint disease, carpal tunnel syndrome, and chronic pain syndrome. The ALJ

found that these impairments, either singly or in combination, did not meet or medically equal

the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.

Given these impairments, the ALJ concluded Hastrich can perform less than the full range of

light work. Specifically, she can lift and carry 10 pounds frequently and 20 pounds occasionally.

She can sit in two-hour increments up to eight hours, can stand and walk in two-hour increments

up to eight hours, but she needs to sit or stand at will without needing to leave her workstation.

She can occasionally climb ramps and stairs, but cannot climb ladders, ropes or scaffolds. She

can occasionally stoop, kneel, crouch and crawl. She can occasionally reach, including overhead,

handle, finger, and feel. She can frequently grasp. She must avoid exposure to the cold, to

dangerous machinery, and to unprotected heights. She is able to remember, understand and carry

Page 5 - OPINION AND ORDER

out simple and detailed, but not complex, tasks consistent with an SVP of one or two.

Given this residual functional capacity ("RFC"), a VE testified that Hastrich could not perform any of her past work.  She could, however, perform work as a furniture rental clerk and tanning salon attendant.  Relying on this testimony, the ALJ found Hastrich not disabled.

## FACTS

Hastrich, who was 34 years old on her alleged onset date of disability, has a high school degree and attended some community college courses.  At 18, she began working at a pizza restaurant and then at G.I. Joe's.  For seven years, she sold and delivered windshields, but then stopped working for eight years to raise her three children.  She and her husband divorced and Hastrich began working as a welder while simultaneously raising her children as a single mother.  Her job as a welder lasted for five years until she suffered, in 1999, an on-the-job injury to her shoulder from repetitive movement.  She recovered a small settlement on her workers' compensation claim, and sought training and obtained a license as a health and life insurance agent.  She quit that work after only a few months as she was not successful at it.  She then worked at various jobs, including at a woman's prison (too sad), delivering mail (too physically demanding), flagger (signs too heavy), security guard (quit to take care of her dying mother), and occasional housecleaning in her sister's business.  None of these jobs lasted any longer than five months.  She now complains of chronic pain, repetitive stress syndrome, and carpal tunnel syndrome, and contends she cannot work because she experiences pain, drops objects, and is unable to concentrate.

Hastrich was diagnosed with carpal tunnel and tendonitis in 1987; she had surgery on both hands in 1992.  She was diagnosed with depression in 1999 and has been treated with anti-

Page 6 - OPINION AND ORDER

depressants since then.  Because of the shoulder pain she experienced in her welding job, Lawrence Tremaine, D.O., encouraged Hastrich in June 1999 to find work not involving repetitive arm or shoulder motions.  He diagnosed her with medial epicondylitis, lateral epicondylitis [tennis elbow], and thoracic myositis [muscular pain] with secondary paresthesias. After January 2000, Hastrich did not seek care for her shoulder until September 2002 when she sought out physical therapy.  At that time, she reported mildly disturbed sleep and the inability to do her usual work.  She could drive with a moderate increase in symptoms and could engage in most, but not all, of her usual recreational activities.  Moving her arms for longer than four hours a day increased her pain.

More than a year later, in December 2003, Hastrich established care with the OHSU Richmond Family Medical Clinic complaining of shoulder and upper back pain.  Her shoulder examination reflected a normal left shoulder except for a slight decrease in internal rotation; her back examination was normal.  To treat her depression, her provider replaced Effexor with Wellbutrin.  In January 2004, after sledding with her children, pulling their sleds, and breaking up a fight between two teenaged boys, she complained of shoulder pain.  She received prescriptions for Salsalate (NSAID), Flexeril, and a one-time only prescription for Percocet.  In February, she received acupuncture and counterstrain therapy, providing "[s]ignificant improvements both subjectively and objectively[.]"  Tr. 692.  She received a prescription for Vicodin.  She started a new job as a flagger in April and complained of shoulder/back pain, intermittent hand/arm numbness, and depression; she was prescribed Percocet and physical therapy.  In August, she reported her shoulder pain was better with a job change, and the Celexa was helping with her depression.

Page 7 - OPINION AND ORDER

In February 2005, Hastrich's neck pain was worse because she helped a friend move. Similarly, in November, Hastrich complained of arm and neck strain from her own move and related stress. At the end of December, Hastrich went to the emergency room for a fever, cough, and headache, and reported she is "otherwise healthy." Tr. 638. In 2006, Hastrich continued to receive treatment for her shoulder injury and depression, and was switched from Percocet to Oxycodone. She reported her shoulder pain was not improving but was controlled; Cymbalta was helping her depression. She was involved in a car accident in April; she reported being able to function normally, but slowly, on Methadone and Oxycodone. She began receiving chiropractic treatment. In August, she reported her pain was close to her baseline from before the car accident.

Hastrich sought treatment for a probable thumb trigger finger in September. Patrice Eiff, M.D., gave her an injection, but noted "some chronic pain behaviors with exaggerated response to minimal palpation." Tr. 875. In December, she sought a medical marijuana prescription and an increase in her Methadone. The nurse noted she was moving about easily and laughing and joking throughout the visit. Tr. 865.

Oleg Reznik, M.D., Hastrich's treating physician at the clinic from January 2007 through March 2009, completed a function form on March 26, 2009, diagnosing Hastrich with depression, anxiety, chronic low back pain, polymyalgia, bilateral carpal tunnel, bilateral epicondylitis, and trigger thumb. As a result of these impairments, according to Dr. Reznik, Hastrich experienced pain in her back and arms, and sedation from the medications. He believed Hastrich could lift and carry less than ten pounds, could stand and walk for less than two hours a day, and could sit for less than two hours a day. He believed she would need to lie down during

Page 8 - OPINION AND ORDER

the day for two to four hours.  He expected Hastrich would miss more than two days a month due to intermittently worsening pain.  He believed Hastrich would experience sedation and decreased concentration as side-effects from her medications.  Tr. 746.  Dr. Reznik's chart notes are described in more detail below.

On November 5, 2010, Cat Livingston, M.D., MPH, declined to complete disability paperwork for Hastrich because the form asked her about a disorder of the spine with nerve root compression.  Hastrich's medical records did not support such a problem.  Dr. Livingston also declined to approve medical marijuana for her.  Hastrich expressed an interest in having Dr. Reznik complete her disability paperwork instead.  Hastrich was then treated by Nicholas Gideonse, M.D., who completed her medical marijuana paperwork on November 17, 2010.

Hastrich reported to her nurse practitioner in March 2011 that she experienced no sedation or other side effects from her pain medications and that she functioned better with the medications.  She was still taking 10 milligrams of Methadone three times a day, 5 milligrams of Oxycodone three times a day, and Prozac.  Hastrich reported feeling depressed with no motivation.  Her Prozac dose was increased and she was directed to continue counseling.  Tr. 1151.  In August, Hastrich appeared mildly depressed, with moderate insight, and linear thought content.  Her Prozac dosage was increased.  She reported sitting at home, feeling stressed out financially and waiting for SSI.  She did not have a car, but had friends who drove her.  Her pain was steady, but worse with activity, although physical therapy in the morning helped.

In January 2012, Hastrich reported needing medication for pain adjacent to her right shoulder blade.  She told her provider that she liked being on both Methadone and Oxycodone because the Methadone brought her down and the Oxycodone brought her up.  She reported pain

in her palms and arms.

In addition, Hastrich has been examined by a number of doctors.

With respect to her psychological condition, on August 10, 2006, M. John Givi, Ph.D., Psy.D., examined Hastrich and diagnosed her with major, recurrent depressive disorder. He placed her at 60-62[1] on the Global Assessment of Functioning (" GAF") scale. He did not believe Hastrich's anxiety and depression would affect her ability to obtain employment. Tr. 710. Hastrich told Dr. Givi that she spent her day running her kids around, cooking for them, working in her yard, and watching her kids play sports. Every few days, she did laundry, went grocery shopping, drove her own car, and visited with friends. She reported she "enjoys cooking, spending time with her children, gardening, and playing volleyball." Tr. 712.

David Gostnell, Ph.D., examined Hastrich on March 14, 2007. She was taking 10 mg of Methadone four times a day, 15 mg of Oxycodone a day, Prozac, Salicylate (aspirin), and 1 gram a day of marijuana. She recently began walking on a track with her son and daughter. She complained of chronic pain in her left arm, shoulder, neck and hand, daily headaches, and bilateral hand numbness every morning for thirty minutes. Strenuous activity and stress aggravated her pain. Dr. Gostnell tested her and found "significant problems with concentration and short-term memory." Tr. 768. She presented with anxiety, distractibility, and impulsiveness.

---

[1]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. A GAF of 51 to 60 means "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)." The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV"). A GAF of 61 to 70 means "**Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships**." Id.

He noted the number of medications, including methadone and marijuana, must be considered as an explanation for her presentation and test performance.  Dr. Gostnell was unable to complete his testing because she failed to come to appointments.  He opined that Hastrich's "polypharmacy dependence, which may be maintained by ongoing stressful relationships in addition to chronic pain, is the most likely cause of both her cognitive difficulties and inability to keep appointments."  Id.

Kay Dieter, M.D., examined Hastrich on August 16, 2010.  She was still taking Prozac, 10 mg of Methadone three times a day, 5 mg of Oxycodone three times a day, and medical marijuana.  On a good day, Hastrich visited her friends.  Her 18-year-old daughter cooked and did the yard work.  Her 21 and 22-year-old sons helped with the laundry, housekeeping and chores.  Hastrich occasionally went outside and cut a bouquet of flowers and watered a little.  Hastrich fed and watered her dogs.  She would not use public transportation because the movement bothered her and she did not like the people on the bus.  Dr. Dieter diagnosed Bipolar, type 2, panic disorder, PTSD, and obsessive-compulsive disorder traits.  She assigned a GAF of 70.  Dr. Dieter opined Hastrich's problems "may be treatable with likelihood of recovery and improvement over the next 12 months if trialed on appropriate psychotropic medications."  Tr. 1118.

Assessing her physical condition, in August 2005, Ryan W. Vancura, M.D., examined Hastrich who complained of back pain, shoulder pain, carpal tunnel syndrome, thumb pain, and Meniere disease.[2]  Hastrich reported she cooked a little, but primarily supervised her daughter in

---

[2]A disorder of the inner ear causing vertigo.  Merriam-Webster Medical Dictionary, available at www.merriam-webster.com/medlineplus/Meniere's disease.

the kitchen.  Similarly, she did some of the laundry but needed help lifting clothes in and out.

She supervised gardening and yard work.  She took care of herself, but needed help with smaller

clasps and clips on her clothes and jewelry.  Hastrich could easily transfer from the chair to the

examination table.  She sat comfortably and was able to remove her shoes with minimal

difficulty.  Dr. Vancura noted paravertebral muscle spasm and tenderness in the right paraspinal

region at Hastrich's scapula, as well as in the lumbar spine region.  He also found bilateral

tenderness to palpation at the sacroiliac joints.  He noted positive drop arm test of the left upper

extremity and evidence of right shoulder impingement.  Dr. Vancura diagnosed chronic back

pain, chronic bilateral shoulder pain, bilateral hand pain possible from carpal tunnel syndrome,

bilateral thumb pain with some locking at the base of the left thumb, reported history of

Meniere's disease but not a serious debilitating form, and bilateral tenderness over the lateral

elbow epicondyle suggestive of lateral epicondylitis.  Dr. Vacura thought Hastrich could stand,

walk and sit up to six hours each, so long as she had breaks to stretch her back.  She could lift

and carry 10 pounds frequently and 20 pounds occasionally.  She could frequently reach, handle,

finger and feel.  Tr. 1120.

On September 7, 2006, Christopher Komanapalli, MD, examined Hastrich and diagnosed

upper extremity weakness from her on-the-job injury and a car accident, and carpal tunnel

syndrome.  He opined she could stand and walk six hours out of an eight-hour workday, and

could sit for six of eight hours.  She could lift or carry 10 pounds frequently and 20 pounds

occasionally.  She had no limitations on bending, stooping or crouching.  She could only

occasionally reach, feel, grasp and finger due to her carpal tunnel syndrome.  At that time, she

reported being able to clean her home and perform yard work.  She could take care of herself,

Page 12 - OPINION AND ORDER

drive and travel. She was taking Salicylate, Prozac, Oxycodone, Methadone, and medical marijuana. Tr. 716.

In addition to these treating and examining physicians' opinions, four doctors reviewed Hastrich's medical record. Martin B. Lahr, M.D., MPH, was unable to offer an opinion on December 14, 2009 because Hastrich failed to cooperate by answering questions. Tr. 963.

Neil E. Berner, MD, opined on September 10, 2010 that Hastrich could frequently lift and carry 10 pounds, and could occasionally lift and carry 20 pounds. She could stand and walk for six hours out of eight, and could sit for six hours out of eight. She could not reach overhead, could not constantly handle, grasp or grip bilaterally, and could not constantly finger, point, pinch, type or write. Tr. 171.

Dr. Lahr again reviewed the record on February 7, 2011 and concluded Hastrich could frequently lift and carry 10 pounds, could stand and walk for six hours in an eight-hour day, could sit for six hours in an eight-hour day, and was unlimited in pushing or pulling. She could not frequently reach overhead, and she could not constantly handle, grasp or grip. She could not constantly finger, point, pinch, type or write. Tr. 189.

Paul Rethinger, Ph.D., on September 4, 2010, identified an anxiety disorder as Hastrich's primary mental disorder. He found her to have no restriction in her activities of daily living, no difficulties socializing, moderate difficulties maintaining concentration, persistence or pace, and no episodes of decompensation. He thought she was moderately limited in her ability to understand and remember detailed instructions, but could understand and follow simple one- and two-step tasks. Tr. 173.

Kordell Kennemer, PsyD, offered a similar opinion on January 31, 2011. Dr. Kennemer

thought Hastrich was capable of understanding and following simple one- to two-step tasks.  Tr. 190.

## DISCUSSION

I.    Medical Evidence

The ALJ gave limited weight to Dr. Reznik's opinion because she found it to be inconsistent with the record as a whole and unsupported by explanation or references to objective evidence.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician.  More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual.  Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  Id. (treating physician); Widmark v. Barnhart, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician).  Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record.  Orn, 495 F.3d at 632; Widmark, 454 F.3d at 1066.  The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician.  Widmark, 454 F.3d at 1066 n.2.

Dr. Reznik's opinion was contradicted by every other opinion from the examining and consulting physicians.  As a result, the ALJ was required to give only specific and legitimate reasons to discount Dr. Reznik's conclusions about Hastrich's functional limitations.  Dr. Reznik

Page 14 - OPINION AND ORDER

believed Hastrich's main symptoms were pain in her back and arms and sedation from her

medications.  As the ALJ pointed out, Dr. Reznik offered very little support for his opinions,

which are inconsistent with the record as a whole, and which are not supported by his treatment

notes.  Hastrich herself reported no sedation effect from her medications.  Additionally, Dr.

Reznik's  treatment notes regularly describe Hastrich as alert, cooperative, healthy, smiling, in no

apparent distress, with normal posture, behavior, mood, and affect, and normal orientation,

judgment, insight, and memory.  Further, throughout the chart notes, Hastrich typically described

her medication as providing adequate pain control and Dr. Reznik reported her pain syndrome to

be stable.  Tr. 1010 (3/13/09, "adequate pain control with an improved ability to maintain

activities of daily living and work"); 776 (12/3/08); 780 (11/25/08); 786 (11/5/08, describing

"improved ability to maintain activities of daily living and work"); 790 (8/7/08, same); 793

(7/16/08); 805 (6/2/08, describing "adequate pain control with an improved ability to maintain

activities of daily living and work"); 807 (4/17/08, same); 814 (3/19/08, same); 817 (3/5/08,

same); 820 (2/19/08, same); 831 (11/13/07, stable chronic pain with relief from opioids, less

depressed); cf. Tr. 842 (4/26/07; stable chronic pain treatment; worsened depression); 847

(4/4/07, feels more depressed); 857 (1/29/07; fell and injured left elbow and knee when running

after dog).  These are all specific and legitimate reasons to discount Dr. Reznik's opinion about

Hastrich's functional limitations, including his opinion that she would miss work two days a

month.  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ is not

required to accept the opinion of a physician, even a treating physician, if the opinion is "brief,

conclusory, and inadequately supported by clinical findings").

       In sum, the ALJ did not err in his treatment of Dr. Reznik's opinion.

Page 15 - OPINION AND ORDER

II.    <u>Lay Witness Testimony</u>

Plaintiff's good friend and long-time neighbor Karen Webb testified in person, and completed a questionnaire, about her observations of Hastrich.  Kenneth Mattiucci, also a friend, reported his observations about Hastrich's abilities.  The ALJ gave each witness' report some weight.  Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness.  <u>Stout v. Comm'r of Soc. Sec. Admin.</u>, 454 F.3d 1050, 1053 (9th Cir. 2006).

Webb testified to seeing Hastrich's hands and fingers get red and swollen; she helped Hastrich button or zip her clothing.  Hastrich no longer cooked or gardened like she used to, and she dropped things like phones and remote controls.  Hastrich would lose her balance.

The ALJ gave Webb's testimony some weight because it was "generally consistent with evidence showing the claimant's conditions have reduced [her] functional ability." Tr. 26.  The ALJ thought the RFC, limiting Hastrich to only occasionally stooping, kneeling, crouching, and crawling, and occasionally reaching, handling, fingering, and feeling, was consistent with Webb's testimony.  The ALJ noted, however, that any balance problems were not consistent with the medical record.  With respect to this portion of the Webb's testimony, Hastrich does not dispute the ALJ's reasoning.

Webb additionally completed a form reporting that her daily visits with Hastrich involved drinking coffee, watching television, and talking together.  Hastrich bathed, dressed, ate food, and watched television during her day.  Before her condition worsened, Hastrich was able to garden, work, drive, walk long distances, and complete household chores.  She no longer did these things.  She needed help with buttons, zippers and earrings because of numbness in her

fingers.  She no longer cooked because she had no feeling in some of her fingers.  She was depressed and in pain, got extremely car sick when she rode in cars, and she did not go out alone because she lost things and forgot where she was.  She did not drive due to pain, dexterity and reflex problems, and memory problems.  She could not lift more than five pounds due to pain and numbness, and she had concentration and memory problems due to pain, medication and depression.  She was extremely depressed and overreacted to simple changes or obstacles.  She invited guests to the house.  She could only pay attention for seconds at a time.

The ALJ gave the report some weight "because it is generally consistent with the evidence of record."  Tr. 25.  The ALJ did note some inconsistencies, which she viewed as weakening the report, such as that Hastrich testified she continues to garden.  Hastrich reported she does not drive because she does not have a car, not because of any impairments. Additionally, it was unclear to the ALJ how Hastrich "converses and watches television if she can only pay attention for a matter of seconds."  Tr. 25.

Hastrich points out that in her testimony to the ALJ, she described hand impairments affecting her ability to drive, and she argues the ability to water a plant does not mean she can garden.  Finally, a person can watch television or have a conversation, but not remember what was said five minutes later; her psychological testing reflected memory and concentration difficulties.  Tr. 766.

The ALJ's analysis is supported by the record.  Hastrich herself indicated in her function report that she drives.  Tr. 394.  She noted in the same report that she is able to "water plants, *plant flowers*, fix broken hearts, dust, shopping, errands."  Tr. 393 (emphasis added).  In addition, she told Dr. Givi she spends her day driving her kids around, cooking for them,

"working out in the yard," and watching her kids play sports.  Tr. 712.  She told Dr. Komanapalli

that she cleans her home, performs yard work, is able to care for herself, and is able to drive and

travel.  Tr. 717.  Finally, she told one of her care providers that she was "[s]tressed out

financially and waiting for SSI; sits at home and does not have a car.  Has friends that drive her."

Tr. 1157.  Further, the ALJ found Hastrich's testimony not credible, which is not a conclusion

Hastrich challenges here.  Finally, Webb's exaggerated report that Hastrich can only concentrate

for "a few seconds" is inherently incompatible with Webb's report that Hastrich converses with

Webb and watches television, and with Hastrich's report that she watches movies. Accordingly,

the record reflects support for the ALJ's conclusions.  Carmickle v. Comm'r of Soc. Sec.

Admin., 533 F.3d 1155, 1163-64 (9th Cir. 2008) (inconsistency between a claimant's activities

and a lay witness' report is a specific and germane reason).

Finally, Mattiucci reported that Hastrich spent her day getting her kids ready for school,

helping them with their homework, and performing daily housework including vacuuming,

mopping, sweeping, some cooking and grocery shopping.  Hastrich prepared her own meals,

including sandwiches and three course meals.  She was able to dust, do the dishes, make some

repairs, and water flowers.  She went outside often.  She shopped for food three times a week.

Hastrich's hobbies included hanging out with her kids, "flowers," fishing, racquetball, and

shooting guns.  Tr. 350.  She did these activities well, but not often.  She "hardly ever" fished,

went bowling or shot guns.  Id.  She played with her kids and took them to sports.  She could

walk for 15 minutes at a time before needing to rest 2 minutes.  She "seems to have times where

[she cries] and complains of her life being so difficult."  Tr. 352.  Finally, since her injury,

Mattiucci noticed that Hastrich "is depressed and [had] lost the ability to maintain a good job.

Page 18 - OPINION AND ORDER

Over the yrs she had the opportunity for good jobs but lost the desire because of the injuries.

She's slowed down considerably."  Tr. 353.

The ALJ gave this report some weight, finding it to be consistent with the record as a

whole; while Hastrich's functional abilities have been reduced, she is able to perform a variety of

activities.  Hastrich argues that an ability to perform chores or walk for a few minutes at a time

does not confirm an ability to work full time.  Looking at Mattiucci's report as a whole, however,

he describes someone who is able to play with her kids, prepare her own meals (including three

courses), vacuum, mop, sweep, dust, do the dishes, make repairs, and grocery shop.  She can

walk for 15 minutes at a time and needs only 2 minutes to rest and, although she does not do

them often, she is still able to fish, play racquetball, and shoot guns.  The ALJ adequately

addressed Mattiucci's report.

The ALJ did not err in his treatment of the lay witness reports.

III.    Work in the National Economy

Finally, Hastrich challenges what she describes as a conflict between the ALJ's express

acceptance of Dr. Rethinger's opinion that she could perform work requiring her to understand

and follow simple, one-to-two step tasks in a routine, slow-paced setting and the jobs the ALJ

identified requiring a GED (general educational development) reasoning level of 3.

The two jobs identified by the VE, and accepted by the ALJ, that Hastrich could perform

are tanning salon attendant and furniture rental clerk.  Hastrich points out the tanning salon

attendant is not a job listed in the Dictionary of Occupational Titles ("DOT"), and the closest

matching job is medium-level work.  The Commissioner concedes the error, but argues that the

alternative job is sufficient to meet its burden.

Page 19 - OPINION AND ORDER

The question, then, is whether it was improper for the ALJ to rely on the job of furniture rental clerk, which has a GED reasoning level of 3, when Hastrich is limited to performing jobs requiring only simple, one-to-two step tasks.  GED reasoning levels 1 through 3 are as follows:

> LEVEL 1:  Apply commonsense understanding to carry out simple one- or two-step instructions.  Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

> LEVEL 2:  Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations.

> LEVEL 3:  Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form.  Deal with problems involving several concrete variables in or from standardized situations.

U.S. Dep't of Labor, DOT, App. C, 1991 WL 688702 (4th ed. 1991).

The Commissioner urges that the GED levels reflect the educational level required for the job, and should be separated from the skills required.  The Ninth Circuit has not addressed this issue.  However, the majority of district courts in this Circuit have concluded a limitation to simple and routine work is inconsistent with a GED reasoning level of 3.  Celedon v. Colvin, No. 1:13-cv-00449-SMS, 2014 WL 4494507, at * 9 (E.D. Cal. Sept. 12, 2014) (listing nine cases from the California district courts and stating the "[w]eight of authority has concluded limitation to simple, repetitive tasks is inconsistent with GED reasoning level 3"); see also Gottschalk v. Colvin, No. 6:13-cv-00125-JE, 2014 WL 17450000, at *5 (D. Or. May 1, 2014) (collecting cases; same conclusion).  Indeed, upon examination of the language in the DOT describing the

Page 20 - OPINION AND ORDER

GED reasoning levels, contrary to the Commissioner's interpretation, it appears the GED reasoning scale reflects what reasoning skills are required for the worker to satisfactorily perform the job. DOT, App. C, 1991 WL 688702 (GED section "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance"); see also Ball v. Astrue, No. 3:09-cv-00764-HU, 2010 WL 3420166, at *16 (D. Or. Aug. 27, 2010) (same reading).

Although the ALJ asked if the VE's testimony was consistent with the DOT, and the VE testified it was, there is an apparent conflict between Hastrich's RFC and a job requiring something more than an ability to carry out simple one- or two-step instructions.[3] Accordingly, the ALJ should have requested a justification for this apparent conflict with the DOT. Massachi v. Astrue, 486 F.3d 1149, 1152-53 (9th Cir. 2007). Because there is no evidence in the record to support the VE's deviation from the DOT, the ALJ's step five analysis is not supported by substantial evidence in the record.

I am not convinced Hastrich is disabled. However, I must reluctantly remand the case because the record is not fully developed to support the ALJ's nondisability decision. Harman v. Apfel, 211 F.3d 1172, 1178-79 (9th Cir. 2000) (remand when there are issues to be resolved before a determination of disability can be made).

---

[3]Indeed, on remand, the ALJ should carefully consider whether an RFC limiting Hastrich to carrying out simple *and detailed*, but not complex, tasks accurately captures Dr. Rethinger's opinion limiting her to simple, one-to-two step tasks in a routine, slow-paced setting. The distinction may prove relevant to whether the VE is limited to jobs requiring only a GED reasoning level of 1. Chase v. Colvin, No. 6:12-cv-01857-HZ, 2013 WL 5567082, at *5 (D. Or. Oct. 9, 2013) (express restriction to simple one- and two-step instructions conflicts with jobs requiring reasoning level 2).

## CONCLUSION

The decision of the Commissioner is reversed.  This action is remanded to the

Commissioner under sentence four of 42 U.S.C. § 405(g) to further develop the record as

explained above.  Judgment will be entered.

IT IS SO ORDERED.

Dated this ____3rd_____ day of October, 2014.


_____/s/ Garr M. King_____
Garr M. King
United States District Judge